**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SARAH GUBBINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 21 C 2582 |
| | ) | |
| **LIFE INSURANCE COMPANY OF** | ) | **Judge Thomas M. Durkin** |
| **NORTH AMERICA,** | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarah Gubbins has filed suit against Defendant Life Insurance Company of North America ("LINA") to recover long-term disability benefits pursuant to an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 19 U.S.C. § 1132(a). Currently before the Court is Plaintiff's motion to compel responses to certain document requests. For the reasons stated here, the motion is granted in part, denied in part, and denied as moot in part.

## BACKGROUND

Plaintiff is an insured participant in a long-term disability ("LTD") plan sponsored by her former employer, Lenovo (United States), Inc. (Doc. 1 ¶ 4). LINA insures the plan, serves as the claim administrator of the plan, and is responsible for paying any disability insurance benefits owed under the plan. (*Id.* ¶ 5). To qualify for LTD benefits, a participant must establish that she is disabled within the meaning of the plan. Initially, a participant must show that she is unable to perform the material and substantial duties of her "Regular Occupation." (*Id.* ¶ 10). After benefits have been payable for 12 months, however, a participant is considered disabled only if she is (1) "unable to perform the

material duties of any occupation for which you are, or may reasonably become, qualified based on education, training or experience"; and (2) "unable to earn 60% or more of your Indexed Earnings." (*Id.*).

On August 20, 2018, Plaintiff stopped working as a "REDWS Security Specialist," a medium duty occupation, due to symptoms associated with several medical conditions (*id.* ¶¶ 11, 12), and applied for disability benefits. Though this lawsuit concerns only LTD benefits, the Administrative Record includes documents related to both the LTD claim and Plaintiff's request for short-term disability ("STD") benefits.

### A. Plaintiff's Claim for Benefits

Plaintiff's effort to secure disability payments began with an application for STD benefits (the date of the application is unknown). LINA denied the STD claim on October 25, 2018 citing a lack of evidence of loss of functioning. (*Id.* ¶ 13). While Plaintiff appealed that decision, she also sought LTD benefits under the plan. LINA denied the LTD claim on September 19, 2019. (*Id.* ¶¶ 14, 16). A week later, on September 26, 2019, LINA overturned its denial of STD benefits. (*Id.* ¶ 17). That same day, a LINA Medical Director, Dr. Randall Updegrove, submitted a 13-page report opining, in relevant part, that Plaintiff could frequently sit and rarely stand and walk, and then only with an assistive device. (*Id.* ¶¶ 32, 42).

On December 11, 2019, LINA overturned its denial of LTD benefits and found that Plaintiff was disabled under the plan because she was unable to perform the material and substantial duties of her medium level "Regular Occupation." (*Id.* ¶¶ 10, 20). LINA paid Plaintiff LTD benefits from February 26, 2019 to March 15, 2020. At that point, since LTD benefits had been payable for 12 months, LINA informed Plaintiff that it needed to

determine whether she was capable of performing any other occupation. (*Id.* ¶ 37). LINA asked a Nurse Case Manager to determine Plaintiffs' medical restrictions and limitations, and the Nurse referred the file to Medical Director Penny Chong.[1] (*Id.* ¶ 39). Plaintiff believes this was improper because LINA had already approved LTD benefits based on Dr. Updegrove's September 26, 2019 opinion. (*Id.*). LINA says that Dr. Updegrove rendered his opinion in connection with Plaintiff's claim for STD benefits, not LTD benefits. (Doc. 27, at 8).

In any event, on April 23, 2020, LINA terminated Plaintiff's LTD benefits based on its determination that she could perform full-time sedentary work. (Doc. 1 ¶ 40). Plaintiff objects that this decision was incompatible with Dr. Updegrove's opinion. Specifically, Plaintiff argues that sedentary work requires an ability to occasionally walk and stand, but Dr. Updegrove opined that Plaintiff could only do so rarely with an assistive device. (*Id.*). Plaintiff notes that Dr. Updegrove's opinion was less restrictive than a March 30, 2020 assessment from her treating physician, Dr. Lori Siegel, and a March 2019 functional capacity evaluation ("FCE") by Ahmed Hassan, DPT. (*Id.* ¶¶ 14, 40). In further support of her claim, Plaintiff submitted an updated assessment from Dr. Siegel dated September 10, 2020 reiterating that Plaintiff can only rarely stand and walk with an assistive device. (*Id.* ¶ 42). Plaintiff also provided a September 28, 2020 vocational assessment from James J. Radke opining that Plaintiff's "maximum work capacity would be that of a half-time Sedentary worker," and that she would only command an entry-level wage due to a need for training and some job experience. (*Id.* ¶¶ 43, 44).

---

[1]     Dr. Chong's opinion is not in the record.

### B.   Plaintiff's Appeal of the Decision to Terminate LTD Benefits

Plaintiff submitted her timely appeal of the termination of her LTD benefits on October 19, 2020.  (*Id.* ¶ 47).  The following month, on November 17, 2020, LINA sought an assessment of Plaintiff's functioning from Medical Director Dr. Rajat Bhatt.  Dr. Bhatt concluded that Plaintiff could walk frequently and stand continuously with no restrictions. (*Id.* ¶ 49).  On December 29, 2020, LINA obtained another assessment from Medical Director Kenneth Park, DO, who opined that there was no medical basis for imposing any limitations on Plaintiff's functioning.  (*Id.* ¶ 50).

On January 25, 2021, LINA Appeal Specialist Dana Tinkey asked Vocational Counselor Glenna Taylor to perform a Transferrable Skills Assessment ("TSA") of Plaintiff using Dr. Updegrove's September 26, 2019 opinion on limitations.  (*Id.* ¶ 51).  Taylor responded to Tinkey on January 26, 2021 "[d]eclining at this time at Appeals Specialist Request.  Additional information required for referral."  (*Id.* ¶ 52).  That same day, Tinkey sent another TSA request to Taylor but this time instructed her to use Dr. Bhatt's medical review.  Taylor accepted the request and concluded, again on January 26, 2021, that Plaintiff could earn the median wage as a Customer Service Representative or an Order Clerk.  (*Id.* ¶¶ 54, 56).  Plaintiff finds the circumstances surrounding the decision to change medical opinions suspicious and improper.

Upon learning that her appeal had been denied, Plaintiff submitted an updated vocational assessment of her own from Radke.  That February 12, 2021 opinion reiterated that Plaintiff was capable of less than full-time sedentary work and that she lacked the necessary skills and training to command more than an entry level wage.  (*Id.* ¶ 62).  On March 9, 2021, LINA asked another vocational counselor at LINA, Nicole Surmacy, to

weigh in on the TSA. Surmacy agreed with Taylor's assessment. (*Id.* ¶¶ 65-67; Doc. 27-3, Vocational Review of 3/9/2021). Approximately a week later, on March 17, 2021, LINA finalized its decision to uphold the denial of Plaintiff's LTD benefits. (*Id.* ¶ 70). LINA then produced a claim file to Plaintiff's counsel consisting of 2,168 pages of documents. (*Id.* ¶ 71; Doc. 27, at 1).

### C. Plaintiff's Discovery Requests

Plaintiff filed this lawsuit in May 2021 and served LINA with document requests on September 20, 2021. LINA answered the requests on November 18, 2021. Plaintiff argues that the answers are deficient in several respects and seeks to compel production of documents responsive to 10 requests. LINA objects that the documents in question are not part of the Administrative Record, will not assist the Court in evaluating LINA's decision to terminate LTD benefits, and are not a proper source of discovery in this case.

## DISCUSSION

### I. Standard of Review

The LTD plan governing Plaintiff's claim for benefits gives LINA discretion to "interpret the terms of the Plan and make benefit determinations." (Doc. 27, at 2-3). The parties agree that in such circumstances, "judicial review of the administrator's decision is limited to an arbitrary-and-capricious standard, under which an administrator's decision will be upheld 'as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 999-1000 (7th

Cir. 2013) (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)). (*See also*, Doc. 23, at 6; Doc. 27, at 3). Since the plan's decision must be sustained unless arbitrary and capricious, "review is limited to the administrative record." *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009).

That said, "'additional discovery is appropriate' in certain 'exceptional cases' in order 'to ensure that plan administrators have not acted arbitrarily and that conflicts of interest have not contributed to an unjustifiable denial of benefits.'" *Mohammed v. Prudential Ins. Co. of Am.*, No. 19 C 3258, 2020 WL 4569696, at *6 (N.D. Ill. Aug. 7, 2020) (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814-15 (7th Cir. 2006)). To receive such limited discovery, a claimant must demonstrate two factors. "First, a claimant must identify a specific conflict of interest or instance of misconduct. Second, a claimant must make a prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect in the plan administrator's determination." *Semien*, 436 F.3d at 815.

Where, as here, a plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," there is an inherent conflict of interest that must be considered as "a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). The decision in *Glenn* "implies a role for discovery" into a plan administrator's conflict of interest and represents a "softening, but not a rejection, of the standard announced in *Semien*." *Dennison v. MONY Life Ret. Income Sec. Plan for Employees*, 710 F.3d 741, 747 (7th Cir. 2013). In all cases, "there can be no doubt that even where some discovery is necessary in a particular case to explore a conflict of

interest, trial courts retain broad discretion to limit and manage discovery under Rule 26 of the civil rules." *Id*.

## II.    Document Requests

Plaintiff argues that all of the documents she seeks belong within the Administrative Record and so should be produced on that basis. She also contends that the requested discovery is proper because there is good cause to believe that it will reveal a defect in the claim review process. LINA takes the position that the Administrative Record consists solely of the 2,168 pages it has already provided to Plaintiff, which includes "all of the medical evidence that LINA reviewed, the reports from physicians who reviewed the medical evidence on LINA's behalf, transferrable skills analysis reports from LINA's vocational rehabilitation counselors, detailed decision letters explaining the reasons for LINA's claim decisions, and [Plaintiff's] appeal letters and arguments." (Doc. 27, at 1-2). LINA denies that there is any conflict of interest in this case, or that the documents sought have any bearing on whether LINA properly decided Plaintiff's claim for benefits. The Court considers these arguments in the context of the specific document requests at issue.

### A.    Request No. 6

Request No. 6 seeks all communications regarding Plaintiff's claim that were "sent or received by" Appeal Specialist Dana Tinkey and Vocational Counselor Glenna Taylor. Plaintiff explains her need for the communications as follows. As noted, Taylor declined Tinkey's first request for a TSA utilizing Dr. Updegrove's opinion "at Appeals Specialist Request." Tinkey then submitted a revised request instructing Taylor to use Dr. Bhatt's opinion instead, which Taylor accepted. (Doc. 23, at 4; Doc. 23-6). Plaintiff wants to

know exactly how Tinkey requested the declination from Taylor and why she did so, and suspects the communications she seeks will provide an answer.  (Doc. 23, at 4).  Plaintiff acknowledges that LINA already has produced some email communications responsive to this request, but objects that LINA has not indicated whether it will produce certain attachments referred to in those emails (which Plaintiff's counsel requested during the meet and confer process), and has not attested that the response is complete.  (*Id.* at 3, 4-5).

Focusing exclusively on communications Tinkey and Taylor had with each other, LINA first claims, without citation, that they are merely "ministerial" in nature and so are not part of the Administrative Record.  (Doc. 27, at 11).  The ERISA regulations provide that "[a] document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information . . . (ii) [w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."  29 C.F.R. § 2560-503-1(m)(8)(ii).  An administrative record is complete when it contains all such "relevant" information.  *See, e.g., Boxell v. Plan for Group Ins. of Verizon Communications, Inc.*, No. 1:13-CV-89, 2013 WL 5230240, at *6 (N.D. Ind. Sept. 16, 2013).  The regulations do not mention a ministerial exception to this relevance standard and LINA does not cite any other authority suggesting one exists.  To the extent Tinkey and Taylor communicated with one another about Plaintiff's claim, the Court agrees that documents memorializing those communications were generated and/or considered in the course of making the benefit determination.  The documents are

thus relevant to Plaintiff's claim and subject to production as part of the Administrative Record.

LINA submitted a declaration from Senior Operations Representative Alexandria Gelb attesting that LINA made "a good faith search as to additional communications between Glenna Taylor and Dana Tinkey by searching its records and by speaking to Dana Tinkey. Glenna Taylor has been out on leave since [Plaintiff's] discovery was initially served, and at this time, LINA cannot confirm the completeness of its production with respect [to] that custodian." (Doc. 27-1, Gelb Decl., ¶ 3). In the Court's view, this declaration raised several questions. To begin, it was not clear whether the term "communications" included both emails and chats. In addition, Gelb merely implied but did not explicitly state that LINA had completed its search for and production of communications between Tinkey and Taylor that were within the custody and control of Tinkey. Furthermore, LINA did not indicate when it expected Taylor to be back at work, or when it could complete production of communications between Tinkey and Taylor that are within Taylor's custody and control. LINA additionally ignored that Plaintiff had requested communications Tinkey and Taylor had with third parties regarding Plaintiff's claim, which are likewise part of the Administrative Record. 29 C.F.R. § 2560-503-1(m)(8)(ii). Finally, LINA failed to indicate whether it had agreed to produce the email attachments Plaintiff's counsel requested.

This Court held a hearing on May 24, 2022 to discuss these concerns with the parties. At that time, defense counsel confirmed that LINA has produced all email communications between Tinkey and Taylor that are in Tinkey's possession, custody, and control. As to the other unresolved questions, the Court instructed LINA to provide a

supplemental declaration. (Doc. 35). On June 20, 2022, LINA submitted a second declaration from Senior Operations Representative Alexandria Collins (formerly Gelb) clarifying that: (1) LINA is unable to search Taylor's emails and chats because they were "generated during the time that LINA was an indirect subsidiary of Cigna Corporation" and "have not been migrated to the email system of New York Life Insurance Company, who has since acquired LINA's disability business"[2]; (2) LINA has searched for and produced all email communications that Tinkey had with third parties regarding Plaintiff's disability claim; (3) Tinkey's chats were not migrated to New York Life and "LINA is unable to search them"; and (4) LINA has exhausted its search for and produced any additional attachments identified in the "Tinkey/Taylor emails that were previously produced." (Doc. 38, Collins Decl, ¶¶ 3-5).

It is not clear from this new declaration whether LINA has possession, custody, or control over Taylor's emails and chats and Tinkey's chats. To the extent LINA has a legal right of access to these communications, it must take steps to obtain and produce them. Plaintiff's motion to compel as to Request No. 6 is otherwise denied as moot.

## B.    Request Nos. 11, 12 and 18

The parties are in agreement that Request Nos. 11 and 12 are "no longer in dispute." (Doc. 28, at 1 n.1; Doc. 27, at 12, 13). Plaintiff's motion to compel responses to these requests is therefore denied as moot.

---

[2]    As noted, LINA previously said it could not confirm that a search for Taylor's emails was complete because she was out on leave. LINA did not explain why Taylor needed to be in the office for a full search to occur but suggested that this would be done upon her return. During the May 24, 2022 hearing, however, Plaintiff's counsel stated he believes Taylor is no longer employed by LINA based on a LinkedIn posting.

Request No. 18 seeks the "DMS Expert Resource Professional Conduct Statement" referenced in LINA 00985. (Doc. 23, at 3; Doc. 23-3, at 13; Doc. 23-5, at 2, stating "This file has been reviewed in accordance with the DMS Expert Resource Professional Conduct Statement."). Since LINA has agreed to produce this Statement pursuant to a protective order (Doc. 27, at 12; Doc. 23-3, at 14), this Court need not decide whether it is part of the Administrative Record or appropriate conflicts discovery. This Court entered the parties' Agreed Confidentiality Order on June 23, 2022 and Defendant is to produce the documents responsive to Request No. 18 by July 5, 2022.

### C. Request Nos. 10, 13, 14 and 17

Request Nos. 10, 13, 14 and 17 seek certain of LINA's internal policies and procedures manuals. Request No. 10 seeks: "Any manual, instruction, policy, procedure, workflow, automation, or guidance regarding which medical reviewer's restrictions and limitations, or medical opinion, a claims reviewer or vocational consultant should use in an any occupation disability review or transferable skills analysis." (Doc. 23-3, at 11). Request No. 13 seeks: "Any manual, instruction, policy, procedure, workflow, automation, or guidance regarding how section 5 of the form found at LINA 00958 becomes populated or completed." (*Id.*). For reference, LINA 00958 is the January 25, 2021 TSA request Tinkey sent Vocational Consultant Taylor, and section 5 is where she wrote "Please complete a TSA based on the 9/26/2019 Dr. Updegrove Review with restrictions." (Doc. 23-6, at 3). Request No. 14 seeks: "Any manual, instruction, policy, procedure, workflow, automation, or guidance regarding use of the form found at LINA 00958." (Doc. 23-3, at 12). Finally, Request No. 17 seeks: "Any manual, instruction, policy, procedure, workflow,

automation, or guidance regarding which percentile of wages [is] to be used for occupations in a transferable skills analysis or any occupation review." (*Id.* at 13).

Plaintiff argues that the manuals and instructions are part of the Administrative Record because they were "before the administrator." (Doc. 23, at 8) (citing *Hughes v. CUNA Mut. Group*, 257 F.R.D. 176, 180 (S.D. Ind. 2009)) (ordering without explanation that the defendant produce "claim procedure manuals and other similar documents about the processing of long-term disability claims" that were "used in or otherwise in existence during [the defendant's] review of [the plaintiff's] claim."). LINA disagrees but also states that Plaintiff already has access to its Disability Claim Policies and Procedures ("P&P"). (Doc. 27, at 12, 13). Not only has LINA "provided a link [to the P&P] on its website that Plaintiff may review confidentially" (Doc. 23-3, at 11), but Plaintiff's counsel also has an electronic version in his possession. (Doc. 27-2).

Plaintiff does not deny that she and her counsel have access to the P&P but she appears to believe that there are two categories of additional policies and procedures LINA has not produced.[3] First, Plaintiff suspects there are policies setting forth which medical opinion an appeal specialist or vocational consultant should apply in reviewing a claim appeal. This belief is once again premised on the fact that Appeal Specialist Tinkey initially instructed Vocational Consultant Taylor to prepare a TSA using Dr. Updegrove's opinion, but after Taylor declined the referral (at Tinkey's request), Tinkey instructed Taylor to prepare the TSA using Dr. Bhatt's opinion instead. In Plaintiff's view, "[e]ither the policy/guidance material was relied upon for the initial referral . . . and disregarded for

---

[3]     Plaintiff does not argue that a printed version of the entire P&P should be included in the Administrative Record, and has not sought to supplement the record in that regard. (Doc. 27, at 12).

the amended referral . . ., or it was disregarded in the initial referral and then relied upon to amend the referral."  (Doc. 28, at 4).

Second, Plaintiff suspects there are policies setting forth which "percentile of wages" a vocational consultant should use.  Plaintiff notes that Vocational Consultant Nicole Surmacy, who LINA asked to weigh in on an appropriate TSA in March 2021, found Plaintiff capable of earning the median wage as a Customer Service Representative or an Order Clerk, whereas Plaintiff's vocational expert Radke concluded she would earn at most an entry-level wage.  (Doc. 28, at 4-5).  In support of her opinion, Surmacy stated that "with respect to wages, the median is a commonly used measure of wage data.  It is the midpoint of a set of data, where half of the values are less and half are higher than the median."  (Doc. 27-3, Vocational Review of 3/9/2021, at 3).  Plaintiff argues that this language "indicates it is a routine practice to assume claimants with any level of qualification for an occupation will earn the median wage or above (logically implying at least a 50% error rate)."  (Doc. 28, at 5).  She thus seeks the "policy" associated with the alleged routine practice of "automatically using the median wage."  (*Id.* at 10).

This Court need not resolve whether the requested policies should be produced as part of the Administrative Record or proper conflicts discovery because LINA has attested that no such policies exist.  As stated in the Collins declaration, "[o]ther than what has already been produced or made available on-line to the Plaintiff, LINA does not have any additional policies not yet produced indicating which medical opinion an appeal specialist or vocational consultant should apply in reviewing a claim appeal, and setting forth the 'percentile of wages' a vocational consultant should use."  (Doc. 38, Collins Decl.,

¶ 6). Based on this sworn representation, Plaintiff's motion to compel as to Request Nos. 10, 13, 14, and 17 is denied as moot.

### D. Request Nos. 2 and 4

Request Nos. 2 and 4 seek templates that Plaintiff believes LINA used to create the letter terminating her LTD benefits ("L88.0 Any Occ Denial") and the letter affirming the termination on appeal ("A19.0 Appeal Affirmation"), which are referenced at LINA 01139 and 01143. (Doc. 23, at 4; Doc. 23-4, at 1, 5).

#### 1. The Templates are Not Part of the Administrative Record

There is no dispute that the specific benefit termination letters sent to Plaintiff are part of the Administrative Record and have been produced. The question is whether the underlying form or template used to generate those letters is also part of the Administrative Record. Plaintiff argues that the answer is yes because in drafting her benefit termination letters, "the claim reviewer necessarily reviewed and considered the documents in their template form." (Doc. 28, at 3). In making this argument, Plaintiff is essentially saying that every single template and form utilized in resolving a benefits claim (as distinct from the edited version of the form specific to a claimant's claim) is necessarily part of the administrative record. Plaintiff does not cite, nor has this Court located any cases supporting such a broad view of "relevant" documents for purposes of an ERISA claim.

The cases Plaintiff does cite, moreover, are easily distinguishable in other respects. In *Hess v. Hartford Life & Accident Ins. Co.*, for example, the plaintiff's attorney submitted a letter that made "explicit reference" to the plaintiff's employment contract and "even quoted the relevant portions." 274 F.3d at 462. The actual contract, however,

14

never made it in front of the claims examiner. *Id.* The court held that even though the claims examiner never saw the contract, it was still "before the administrator" because "the examiner had been alerted not only to the contract's existence, but also to the very language on which [the plaintiff] was relying; he easily could have obtained a complete copy through a simple phone call to [the plaintiff's] lawyer or to [the employer]." *Id.* As the court explained, "[t]he fact that the examiner did not bother to read pertinent evidence actually before him cannot shield [the insurer's] decision from review. To the contrary, this court has noted that the fact that an administrator blatantly disregards an applicant's submissions can be evidence of arbitrary and capricious action." *Id.* at 462-63.

The court also rejected the insurer's contention that the contract was irrelevant, noting that the plan policy "explicitly based [the plaintiff's] benefit level on [his] compensation, and [the] contract . . . is the best evidence of what that compensation was." *Id.* at 463. *See also Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 808-09 (10th Cir. 2004) (where plan administrator knew the plaintiff claimed to be disabled because of narcotics use, it should have obtained additional documentation on that issue because "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement."); *Omasta v. Choices Benefit Plan*, 352 F. Supp. 2d 1201, 1205 (D. Utah 2004) (relying on *Gaither* for the proposition that "the court is not always restricted to the administrative record when applying an arbitrary and capricious standard if the record shows that defendant had knowledge of additional and readily available information that may have shown an entitlement to benefits.").

In *Estate of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060 (9th Cir. 2016), the Ninth Circuit held that the district court erred in rejecting the plaintiff's claim for benefits based in part on his failure to prove that he worked "over 1000 hours a year for the twenty years he was employed" by the defendant as required under the terms of the plan. *Id.* at 1068. The plaintiff had submitted FICA records and W-2 forms but did not have access to documents showing the specific hours he worked. According to the Ninth Circuit, "where a claimant has made a prima facie case that he is entitled to a pension benefit but lacks access to the key information about corporate structure or hours worked needed to substantiate his claim and the defendant controls such information, the burden shifts to the defendant to produce this information." *Id.* The court noted the plaintiff was not "warned at the start of his career that he needed to retain a log of his hours to obtain pension benefits a generation or two later." *Id.*

Finally, the plaintiff in *Helton v. AT & T Inc.*, 709 F.3d 343 (4th Cir. 2013), learned in 2009 that she had been entitled to full pension benefits since 2001 and sought retroactive payments. *Id.* at 347-48. In reviewing the defendant's denial of that claim, the district court considered evidence outside the administrative record indicating that the defendant had not provided the plaintiff with adequate notice of her eligibility for benefits in 2001. *Id.* at 347. The Fourth Circuit held that this was proper since the defendant knew about the evidence when it rendered its decision and the evidence was relevant to assess whether the plan administrator abused its discretion in denying the claim based on the plaintiff's failure to timely request benefits. *Id.* The court rejected the defendant's argument that there was an "absolute bar to considering evidence outside of the administrative record," *id.* at 352, explaining that allowing plan administrators "the

16

unchecked opportunity to pick and choose what evidence in their possession to include in the administrative record" would result in the court "effectively surrender[ing] our ability to review ERISA benefits determinations because plan administrators could simply omit any evidence from the administrative record that would suggest their decisions were unreasonable." *Id.* at 353.

Unlike in *Hess*, *Estate of Barton*, *Helton* and the other cases, there is no evidence that LINA ignored documents, correspondence or other materials relevant to Plaintiff's claim, failed to develop a complete record, or withheld evidence necessary for Plaintiff to prove her entitlement to benefits. Notably, it cannot even be said that the templates themselves contain information directly bearing on Plaintiff's specific claim for benefits. The templates necessarily apply to *any* benefit claim until the point at which they are modified, and Plaintiff already has the modified versions applicable to her case. Plaintiff has not provided any authority demonstrating that the templates she seeks are "relevant" to her claim under ERISA or subject to production as part of the Administrative Record. Her request to compel the templates on that basis is denied.

## 2.   The Templates are Not Proper Conflicts Discovery

That does not end the Court's inquiry, however, because Plaintiff also argues that the templates constitute proper conflicts-related discovery. (Doc. 28, at 8). Though LINA has a "structural conflict of interest" in both determining eligibility and paying benefits (Doc. 28, at 6), this is not alone sufficient to open the door to discovery. As the Seventh Circuit has made clear, it is "not the existence of a conflict of interest—which is a given in almost all ERISA cases—but the *gravity* of the conflict, as inferred from the circumstances, that is critical." *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 365 (7th Cir.

2017) (quoting *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009) (emphasis in original). *See also Mohammed*, 2020 WL 4569696, at *6 ("The mere presence of the structural conflict . . ., without more, is insufficient to open the door to discovery.") (internal quotations omitted). "[C]onflicts are but one factor among many that a reviewing judge must take into account," *Glenn*, 554 U.S. at 116, and they "'carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy.'" *Geiger*, 845 F.3d at 365 (quoting *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012)).

Plaintiff first claims there is a significant conflict of interest necessitating discovery because LINA deliberately tried to withhold Dr. Updegrove's opinion from her. According to Plaintiff, though she requested relevant documents from her file on October 23, 2019, a few weeks after Dr. Updegrove issued his opinion in September 2019, LINA resisted the request and did not produce the records until January 27, 2020. (Doc. 28, at 6; Doc. 1 ¶¶ 18-27). Plaintiff also alleges that LINA omitted Dr. Updegrove's opinion when it produced the Administrative Record to her in 2021 in connection with this lawsuit. (Doc. 1 ¶ 71). This is not evidence that a conflict of interest affected Plaintiff's claim because she admittedly received a copy of Dr. Updegrove's opinion in January 2020 and has been able to use it in pursuing her appeal. Plaintiff also finds it significant that LINA asked her to undergo a functional capacity evaluation in December 2020 even though she provided her own FCEs from vocational expert Radke in March 2019 and September 2020. (Doc. 28, at 7). Plaintiff is free to argue the FCE request was improper but she has not shown that it amounts to a conflict of interest that resulted in a defect in the claim review process.

18

Finally, Plaintiff once again stresses the fact that Appeal Specialist Tinkey initially asked Vocational Consultant Taylor to prepare a TSA using Dr. Updegrove's opinion, then had her use Dr. Bhatt's opinion instead. (Doc. 28, at 7). Plaintiff's counsel represents that in reviewing other claims files from LINA, he has seen benefit termination letters that use the phrase "[t]he most restrictive medical report was utilized for this assessment." (Doc. 23, at 2). Based on that representation, Plaintiff alleges "[u]pon information and belief" that LINA programs its software to automatically include the cited language in all termination letters, and that Appeal Specialists are "required to use the most restrictive of their internal Medical Directors' opinion upon which to base a TSA." (Doc. 1 ¶ 58). Plaintiff further alleges that LINA violated this internal requirement by deleting the automated template language from her benefit termination letters and relying on Dr. Bhatt's November 17, 2020 opinion even though Dr. Updegrove's September 26, 2019 opinion was the most restrictive. (Doc. 23, at 4; Doc. 28, at 7-8).

Since templates are necessarily modified to fit each individual benefits claim, the mere allegation that LINA deleted certain language from a template is not evidence that a conflict of interest affected Plaintiff's claim. Even if it were, the representation from counsel about language found in other benefit termination letters does not provide good cause to believe that discovery of the templates will reveal a defect in the claim review process. LINA has submitted a declaration from Senior Operations Representative Alexandria Gelb attesting that there is no "'template' language that is auto-populated with respect to the most restrictive limitations for letters from LINA relating to LTD terminations or denial of claims on appeal." (Doc. 27, at 11; Doc. 27-1, Gelb Decl., ¶ 3). Moreover,

as discussed in the previous section, there are no policies requiring appeal specialists to use the most restrictive medical opinion.[4]

Since the templates sought in Request Nos. 2 and 4 are neither part of the Administrative Record nor proper conflicts discovery, Plaintiff's motion to compel their production is denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Rule 37 Motion to Compel Responses to Document Requests (Doc. 22) is granted in part, denied in part, and denied as moot in part.

ENTER:

Dated:  June 23, 2022

SHEILA FINNEGAN
United States Magistrate Judge

---

[4]      As noted, there is likewise no policy directing vocational experts to utilize a median wage so Plaintiff's objection that LINA improperly found her capable of earning a median wage does not establish a conflict of interest affecting the claim review process.  (Doc. 28, at 8; Doc. 38, Collins Decl., ¶ 6).